IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

KARL WRIGHT,                          )
                                      )
                    Plaintiff,        )
                                      )
          v.                          )     Case No.
                                      )     13-4136-CV-C-REL-SSA
CAROLYN W. COLVIN, Acting             )
Commissioner of Social Security,      )
                                      )
                    Defendant.        )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Karl Wright seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Titles II and XVI of the

Social Security Act ("the Act").  Plaintiff argues that the ALJ erred in (1) improperly evaluating

the opinion of Garth Russell, an examining orthopaedic surgeon; (2) in discrediting plaintiff's

subjective complaints based on his work history; and (3) in failing to include mental limitations

in the residual functional capacity.  I find that the substantial evidence in the record as a whole

supports the ALJ's finding that plaintiff is not disabled.  Therefore, plaintiff's motion for

summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On December 14, 2010, plaintiff applied for disability benefits alleging that he had

been disabled since April 14, 2010.  Plaintiff's disability stems from arthritis, knee pain and

back pain.  Plaintiff's application was denied on February 9, 2011.  On May 10, 2012, a

hearing was held before an Administrative Law Judge.  On May 21, 2012, the ALJ found that

plaintiff was not under a "disability" as defined in the Act.  On April 19, 2013, the Appeals

Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the

final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.   THE RECORD

The record consists of the testimony of plaintiff and vocational expert Julie Svec, in addition to documentary evidence admitted at the hearing.

### A.   ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1978 through 2011:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1978 | $ 1,287.10 | 1995 | $ 3,318.00 |
| 1979 | 1,365.01 | 1996 | 16,187.00 |
| 1980 | 598.42 | 1997 | 6,032.50 |
| 1981 | 0.00 | 1998 | 8,259.00 |
| 1982 | 677.08 | 1999 | 8,125.00 |
| 1983 | 3,248.76 | 2000 | 8,719.00 |
| 1984 | 8,403.00 | 2001 | 10,014.00 |
| 1985 | 6,286.95 | 2002 | 11,022.00 |
| 1986 | 1,185.14 | 2003 | 8,973.00 |
| 1987 | 0.00 | 2004 | 9,463.00 |
| 1988 | 1,996.00 | 2005 | 8,183.00 |
| 1989 | 3,140.00 | 2006 | 0.00 |
| 1990 | 3,447.00 | 2007 | 0.00 |
| 1991 | 4,012.00 | 2008 | 0.00 |
| 1992 | 6,109.50 | 2009 | 0.00 |
| 1993 | 1,530.97 | 2010 | 0.00 |
| 1994 | 2,038.00 | 2011 | 0.00 |

(Tr. at 158-160).

**Function Report**

In a Function Report dated December 29, 2010, plaintiff indicated he lives alone in a trailer (Tr. at 200-207). He described his day as eating breakfast and then sitting on the couch for the rest of the day. He gets up only to use the bathroom, to get a drink of water, and to microwave a meal for dinner. His back pain and lack of feeling in his legs wakes him up at night. His condition makes it hard for him to put on socks and tie his shoes, he takes fewer showers, he does "little hair care," he shaves much less now. He needs no special reminders to take care of his personal needs and grooming or to take his medication. He prepares all of his own meals. It takes him 25 minutes. He does not do any household chores. He pays someone to do his household chores. He goes out of his home 3 or 4 times a month, and he either drives or rides in a car. He shops for food in stores about once a month for an hour. He is able to pay bills, having bank accounts, and count change. He is able to watch television "real good." He has no problems getting along with family, friends, neighbors or others.

Plaintiff's condition affects his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. His condition does not affect his ability to remember, concentrate, understand, follow instructions, use his hands or get along with others. He handles stress fairly well, and he can handle changes in routine. Plaintiff stated that he falls in the dark due to having no feelings in his legs. He uses crutches a cane and a walker to help him get around.

**Missouri Supplemental Questionnaire**

In a Missouri Supplemental Questionnaire dated December 29, 2010, plaintiff listed the following as his current medications: Simvastatin (lowers cholesterol), Naproxen (non-steroidal anti-inflammatory), Metformin (for diabetes), and Budeprion (antidepressant which aids in quitting smoking). He did not list any pain medication.

**Disability Report - Appeal**

In this Disability Report dated February 23, 2011, plaintiff listed the following as his current medications: Buspirone (treats anxiety), Lisinopril (treats hypertension), Metformin (treats diabetes), Naproxen (non-steroidal anti-inflammatory), Simvastatin (lowers cholesterol), and Vitamin D (Tr. at 220).

**Statement of Plaintiff**

On March 29, 2012, plaintiff wrote a statement indicating that when he goes to Wal-Mart he gets a cart and feels like he is a bother to other people. He spends his life on his back lying on a heating pad. He watches television but gets bored quickly. He does not read. Sometimes he feels like crying for no reason. He sleeps no more than three or four hours at a time due to back pain. He showers rarely because he cannot stand long enough to take a shower. Sometimes he has a hard time making decisions and has to call people for advice. He has lost at least 80 pounds in the last five years (Tr. at 224).

**B.     SUMMARY OF MEDICAL RECORDS**

On May 21, 2000 -- about ten years before his alleged onset date -- plaintiff was in a car accident (Tr. at 227-234, 240-247). He was unrestrained, lost control of his car, and rolled it lengthwise several times. Plaintiff's 8-year-old son was in the car and was restrained. Plaintiff complained of lower back pain and marked pain in his left shoulder. He was listed as a chronic smoker but had no other medical complaints. C-spine series was negative, chest x-ray was normal, lumbar spine was unremarkable. Films of his shoulder showed an AC (shoulder joint) separation of 4 mm. He was told to wear a shoulder immobilizer for three weeks and was given a prescription for Vicodin (narcotic) for pain, 30 tablets with one refill.

About 9 years later, on April 14, 2009, plaintiff saw Brad Moseley, M.D., complaining of dry fingernails (Tr. at 294). His weight was greater than 350 pounds. Dr. Moseley ordered

blood work to check plaintiff's Vitamin D, A1C (for diabetes), and complete blood count. He assessed diabetes mellitus and hypertension.

On August 14, 2009, plaintiff saw Joshua Griggs, M.D., to establish care (Tr. at 291-293, 303, 306-307).

> The patient has a past medical history of degenerative disc disease in the spine with a facet joint arthropathy [disintegration of cartilage] as well as multilevel disc disease in the L4-L5 area, history of type 2 diabetes, Vitamin D deficiency, tobacco abuse, obesity, [and] bilateral knee arthritis. He states that he is having trouble with any walking because of pain, and swelling in his knees has been chronic. He stopped taking all of his medications about 2 months ago. He states he did not trust his previous physician. He did not believe that he had diabetes and when he checked his blood sugars at home, they were normal. He has been getting a little bit depressed and sad, having trouble sleep[ing] because of the pain he is having. . . . He has pain in bilateral lower back and has not even been taking any over-the-counter medications.

Plaintiff reported having smoked a pack of cigarettes a day since he was 12 years of age. On exam he weighed 356 pounds. His back extension, lateral bending and twisting "is all painful but normal." Heel and toe walking was normal. Straight leg raising was negative. No abnormal findings of any kind were noted. Dr. Griggs assessed osteoarthritis of the lumbar spine with degenerative disc disease at L4-L5 and facet joint arthropathy (disintegration of the cartilage). He started plaintiff on Mobic (non-steroidal anti-inflammatory), Elavil (also called Amitriptyline, an antidepressant) for neuropathic pain, Tramadol (a non-narcotic pain reliever) for breakthrough pain, and he recommended an epidural steroid injection. He assessed type 2 diabetes and prescribed Metformin, although no blood sugar level was noted. He assessed Vitamin D deficiency. He advised plaintiff to stop smoking. He counseled plaintiff on diet and exercise. "The patient has a lot of excuses why he cannot exercise. Money is the main reason but he seems to be able to afford a pack of cigarettes a day. I have recommended the water aerobic class which is $5 a session 2 times a week and he is adamantly against that at this point. I explained to him walking is free, so we can initiate that." He assessed bilateral knee osteoarthritis and referred plaintiff to an orthopedic surgeon for possible Synvisc

7

injections.[1]  Dr. Griggs also recommended blood work.

On August 28, 2009, plaintiff saw Dr. Griggs for a follow up (Tr. at 290).  He had been having diarrhea for the past two days and was worried that he was getting dehydrated. Plaintiff had not been using Tramadol regularly.  No examination of the musculoskeletal system was performed.  Plaintiff was assessed with obesity, osteoarthritis of the knees, diabetes, Vitamin D deficiency, fatigue, and being a "smoker."  No treatment is listed other than a recommendation for lab work.

On August 31, 2009, Tara Randle, M.S., (a certified diabetes educator) and Kristi Brown, R.N., M.S.N. (a diabetes educator) wrote a letter to Dr. Griggs who had referred plaintiff to the Diabetes Education Program at Lake Hospital (Tr. at 304).  The letter stated that they had offered a diabetes scholarship which includes a free visit with a diabetes educator and a free diabetes class.  "He **does not wish** to attend an individual session utilizing the scholarship program.  He did not indicate a reason.  He plans to **consider** our free community class this fall." (emphasis in the original).

On September 1, 2009, plaintiff was seen by William Harris, D.O., an orthopedic surgeon (Tr. at 301-302).  Plaintiff reported a two-year history of bilateral knee pain, occasional swelling and occasional giving way without locking.  Plaintiff had 0 to 120 degrees of range of motion (130 is normal) in his right knee with some tenderness.  Left knee also had 120 degrees of range of motion with some tenderness.  He had crepitus (crackling sound with movement of the joint) with no instability.  X-rays of both knees were done and were unremarkable with "very minimal degenerative changes."  He was assessed with chondromalacia (damage to the cartilage under the kneecap) of both knees.  Dr. Harris recommended that plaintiff lose weight.  He gave plaintiff Marcaine and Celestone injections in

---

[1]Synvisc supplements the fluid in the knee to help lubricate and cushion the joint.

both knees.  He was taken off the Meloxicam and started on Naprosyn, another non-steroidal anti-inflammatory.

On December 1, 2009, plaintiff saw Joshua Griggs, M.D., complaining of back pain which he rated a 10 out of 10 in severity (Tr. at 252, 296).  The epidural steroid injection he received three months earlier had "helped a little."  Plaintiff stated that his pain had worsened in the last week due to his remodeling a house.  He said he wanted to talk to a surgeon.  Dr. Griggs assessed chronic back pain and lumbar disc disease.  He refilled plaintiff's Ultram.

On December 10, 2009, plaintiff was seen by Usiakimi Igbaseimokumo, M.D., a neurologist, at the request of Joshua Griggs, M.D., for low back pain (Tr. at 236-238, 248-250, 253-255, 358-360).  "His main complaint is low back pain with no significant leg pain.  He has also reported weakness in both legs, reducing his ability to walk around."  Plaintiff described his pain as a 6 out of 10 in severity.  Plaintiff reported that the epidural steroid injections he received a few weeks earlier had "helped him significantly."  Plaintiff was smoking a pack of cigarettes per day.  Plaintiff was taking Amitriptyline (antidepressant), aspirin, Lisinopril (for hypertension), Meloxicam (non-steroidal anti-inflammatory), Metformin (for diabetes), and Tramadol (also called Ultram, treats moderate to severe pain).  Dr. Igbaseimokumo noted weight gain and joint pains but "no other abnormalities."  Plaintiff was grossly obese.  He had full range of motion in his neck, normal strength in his arms, 4/5 strength in his legs ("and it was unclear how much of this was related to effort or pain, but he was clearly weak in his legs").  Palpation of his thoracic and lumbar spine showed no obvious deformity.  He had mild tenderness in the lumbar spine.  He had a normal gait.  Dr. Igbaseimokumo reviewed plaintiff's January 2009 MRI scans which showed "very mild degenerative changes involving the L5-S1 level."  He recommended that plaintiff lose weight and get an updated MRI.

On February 19, 2010, plaintiff had an MRI of his lumbar spine (Tr. at 261-262). The MRI showed a degenerative disc at L4-5 and L5-S1, moderate to severe central canal narrowing and stenosis (narrowing) at L4-5 with diffuse disc bulge, mild diffuse disc bulge with mild narrowing of the neural canal at L5-S1, possible small left paracentral disc osteophyte (bone spur) at L3-4.

April 14, 2010, is plaintiff's alleged onset date.

Almost 9 months after his MRI, on November 3, 2010, plaintiff saw Dr. Griggs for a "follow up - still doing the same" (Tr. at 287, 289, 335-336). His last visit had been in December 2009 for back pain.

> He has a history of chronic back pain, chronic knee pain, diabetes, hypertension, obesity, hyperlipidemia, and we had referred him to neurosurgery who apparently told him that he was a nonsurgical candidate and we have also referred him to orthopedic surgery who has done some injections in the past but have not been helpful. The patient admits of feeling hopeless and helpless and admits that he has not taken any of his medications for the last several months. . . . He has applied for disability and apparently been turned down thus having difficulty getting around due to his extreme pain, but does not want any pain medications.

Dr. Griggs observed that plaintiff moved very gingerly and slowly. He noted that plaintiff had minimal range of motion of the back, but no further information about that limitation appears in the record. "[It] takes him quite a while to get up from a seated position due to what appears to be knee pain." Dr Griggs made the following assessments:

1.     "Complete decompensation due to major depressive disorder worsened due to chronic medical problems including chronic back pain and knee pain and diabetes and obesity. It is clear that we are not going to make any headway with the patient until we get his mood under better control and get him feeling more hopeful and optimistic. He feels let down by physicians and the fact that he has been deemed to [be] a nonsurgical [candidate] and he also feels let down by society and the other fact that they did not grant him disability. We will start him on Wellbutrin extended release . . . and obtain the idea of inpatient treatment for his

10

depression, although again at this time he is not suicidal".

2.      Lumbar disc disease with multilevel disc bulges and facet joint arthritis on previous MRIs. "Again, offered pain medications and refused. I do not believe the patient is probably [a] very good surgical candidate but epidural steroid injections may be of some benefit and certainly we can adjust medications around to help the pain."

3.      Osteoarthritis of the knees. "In the future we would recommend repeat examination by orthopedics. Consideration of repeat injections and consideration potentially of knee replacement. Fresh x-rays would be of help, but again at this time the patient is so decompensated we do not want to do more than one step at a time."

4.      "Hypertension, off medication."

5.      Morbid obesity. "Worsened due to inability to exercise. We gave him a handout on local water aerobics classes."

6.      Hyperlipidemia, off medication.

7.      Type 2 diabetes, off medication.

8.      Vitamin D deficiency history.

9.      "Disposition. We would strongly recommend the patient reapply for disability given these multiple medical problems and we may need to get a lawyer to help him to do so."

10.     Tobacco abuse. "Advised to quit."

On November 10, 2010, plaintiff saw Dr. Griggs with a chief complaint of fever and cough (Tr. at 286, 288, 337-338). "He continues to have some depressed mood but he is tolerating Wellbutrin. . . . He denies being depressed but complains of anhedonia,[2] hopelessness, and feeling sad." Plaintiff also had an area on his thumb that was a little painful. "He is not interested in seeing an orthopedic doctor on his knees or his back." Plaintiff

_____

[2]The inability to gain pleasure from normally pleasurable experiences.

weighed 348 pounds. On exam, he was noted to ambulate "very gingerly, appearing to be in pain in his back and his knees." He had "minimal range of motion of the back" however, Dr. Griggs did not indicate what the range of motion measurements were or what part of his back had limited motion. He assessed major depression disorder. "This is the root of patient's problems right now as until his depression is under better control he is not going to be able to take care of his other medical problems and hopelessness is very predominating. Patient does not want to go to any counseling or psychiatry. We will continue him on Wellbutrin for now." He was also assessed with type 2 diabetes for which he was restarted on Metformin. He was assessed with osteoarthritis of the knees. "Patient is probably getting close to needing a knee replacement. We offered him an injection. We offered a referral for orthopedics, which he declined." He was assessed with lumbar disc disease. "Again patient does not want any referrals at this time." He was assessed with obesity, hyperlipidemia, stable hypertension, Vitamin D deficiency, and right thumb ganglion cyst. He was assessed with tobacco abuse, "advised to quit." He was assessed with bronchitis "in a smoker." He was not prescribed any pain medication during this visit.

On November 15, 2010, plaintiff had x-rays of his knees (Tr. at 279, 345, 346). Michael Vierra, M.D., noted mild degenerative changes. Dr. Griggs made a note on the report that plaintiff's bilateral knee arthritis was "stable" (Tr. at 280). He had x-rays of his lumbar spine on that same day (Tr. at 281, 344). Dr. Vierra noted no acute abnormality, only mild degenerative changes, and an old slight compression deformity of T12, unchanged. Dr. Griggs made a note on the report that plaintiff's back arthritis was "stable" (Tr. at 281).

On December 13, 2010 -- the day before plaintiff completed his application for disability benefits -- he saw Dr. Harris, the orthopedic surgeon, about the small cyst on his thumb (Tr. at 308-309, 347). "He is on no medications at this time." X-rays of the thumb

were negative, and he had good motion in the thumb. Dr. Harris told plaintiff the cyst could be removed or he could learn to live with it. Plaintiff requested that it be removed.

On December 14, 2010, plaintiff completed his application for disability benefits.

On January 25, 2011, plaintiff saw Dr. Griggs for a follow up on diabetes (Tr. at 339-340). "He had a ganglion cyst treated on January 12th and has been doing pretty well. They actually found a little bit of glass in the wound. Pain is now decreased." Plaintiff was still smoking. He reported difficulty with sleep "due to the thin insulation in his apartment and he has shifted his daytime and nighttime so that he can sleep during the warmer time of day." Although plaintiff's recent blood work showed he continued to be deficient in Vitamin D, he had stopped taking that supplement. "He still has some depression. . . . He still refuses to go to any counseling. He continues to have pain in the knees and in the low back." On exam plaintiff weighed 352 pounds. Dr. Griggs noted that plaintiff moved very slowly and gingerly. "He appears to have pain when he is walking." His exam was all noted to be normal.

He was assessed with major depressive disorder and was continued on Wellbutrin. "Again, emphasized that counseling would be beneficial. The patient still refuses." He was told to restart his Vitamin D supplement. He was assessed with morbid obesity. "Counseled on diet and exercise. Something like water aerobics would be ideal to take the weight off the patient and get his metabolism up. He is not interested." His diabetes was "not optimally controlled" and his Metformin was increased. His hyperlipidemia was "not optimally controlled" and his Simvastatin was increased. He was advised to stop smoking. He was advised to start Lisinopril for hypertension. He was continued on Naproxen (non-steroidal anti-inflammatory) for chronic back pain. He was assessed with knee arthritis but no treatment was provided for that condition.

On January 26, 2011, plaintiff was evaluated by Kim Dempsey, Psy.D., in connection with his disability application (Tr. at 315-318).

He arrived promptly for the evaluation. He provided a valid Missouri driver's license for identification. His gait appeared to be very unsteady and was slowed. He presented with significant difficulty walking, standing, sitting, and getting up from a seated position. He held onto chairs and the wall while walking, and he stopped to take a break every few steps while walking a short distance.

PRESENTING PROBLEM/REASON FOR REFERRAL:

Karl Wright presented with chronic back and knee pain. He presented with labored breathing and appeared to be in pain during the entire clinical interview. The claimant has degenerative disk disease and osteoarthritis in his spine and knees, according to information provided by Disability Determinations from his physician Dr. Griggs. . . . Mr. Wright indicated that Dr. Griggs also believes that the claimant is depressed, but the claimant denied major depressive symptoms. Mr. Wright indicated that he is motivated for tasks, but state[d] that "the mind is willing but the body is not." The claimant reported fatigue and difficulty sleeping due to pain. He indicated that he is isolative and tries to avoid leaving his house, because he has so much difficulty walking and driving due to pain. Dr. Griggs prescribes Naproxen [non-steroidal anti-inflammatory] for pain, Metformin to treat diabetes, Lisinopril to treat high blood pressure, and Simvastatin to treat Mr. Wright's high cholesterol. He also prescribed Budeprion SR to treat depression.

**BACKGROUND INFORMATION:**

. . . Mr. Wright is not currently employed. He last worked for two years in construction and was self-employed during that time. He also indicated working at Ozark Rental. He also worked from age 16 "off and on" until 6 years ago at Plaza Paint and Wallpaper, because his parents owned the business. He indicated that he was a very good worker when he was able to work physically. He noted, "Everybody who knows me usually wants me back."

**CURRENT DAILY ACTIVITIES:**

He lives alone. He reported having insomnia due to pain. . . . He indicated that he "uses a lot of paper plates," because he has difficulty standing and cannot do dishes easily. He stated that he will "do one load of laundry a month." He reported that pain, fatigue, and lack of mobility interfere with his daily functioning.

Mr. Wright smokes one-half pack of cigarettes each day. He denied any current alcohol or drug abuse. He reported using marijuana and alcohol in the past, but denied any symptoms of substance dependence.

<u>MENTAL STATUS:</u>

The claimant was disheveled in appearance and exhibited marginally adequate hygiene. He presented as morbidly obese. He resented with pleasant mood. The claimant attempted to make jokes and appeared to be in good spirits, despite appearing to have significant pain and labored breathing. He shifted in his seat many times during the assessment and presented with difficulty sitting up. He was seated at a table and presented with difficulty holding himself up. He indicated that he "has to sit by keeping [his] shoulders supported." Eye contact was adequate. He was cooperative with the examiner. He denied any history of suicidal ideation. He denied any history of psychiatric hospitalizations or suicide attempts. He denied homicidal ideation. Speech was logical and coherent and was relevant and goal directed. There was no evidence of loose or bizarre thought associations. He did not present with psychotic symptoms during the evaluation.

He appeared oriented to time, place, person, and to the purpose of the assessment. Memory functions appeared mildly problematic. . . . [He had] intact mental control. He appeared to function in the Low Average to Average range of intellect. . . . His math skills appeared mostly intact, but his thinking appeared slowed due to pain. . . .

Daily activities do not appear significantly restricted by psychological distress. He presented with impairment in his interests and personal habits, which he attributed to pain and lack of mobility. He demonstrated deficits in concentration on the mental status tasks, but his performance appeared to be limited by pain. . . . He did not present with problems tolerating normal external stress and vocational pressures due to psychological distress. However, his vocational functioning would likely be limited by his medical issues and obesity. He appeared to be in significant pain during the assessment process and his breathing appeared labored during the entire clinical interview.

Dr. Dempsy assessed adjustment disorder with depressed mood. She found his psychosocial stressors (occupational problems and economic problems) to be moderate and assessed a GAF of 60.[3]

On February 7, 2011, James Morgan, Ph.D., completed a Psychiatric Review Technique and found that plaintiff's mental impairment (affective disorder) was not severe (Tr. at 323-333). He found that plaintiff had only mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration,

---

[3]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

persistence or pace; and no repeated episodes of decompensation. In support of his findings, Dr. Morgan noted that plaintiff had not alleged a mental impairment in his application for disability benefits.

> The claimant has recently started treatment for depression after being diagnosed in 12/10. The claimant was sent for a CE [consultative exam] in 1/11. During this visit he denied major depression symptoms, had a pleasant mood, joked with the examiner, was cooperative, demonstrated coherent and goal directed thoughts, and had normal speech. He was diagnosed with adjustment d/o [disorder] with a depressed mood and given a GAF score of 60. ADLs, completed by the claimant, noted that limitations are due to physical impairments rather than his mental impairment. This is supported by the MER [medical records].

> On February 9, 2011, plaintiff's application for disability benefits was denied.

> On February 17, 2011, plaintiff saw Dr. Griggs for a follow up on back pain (Tr. at

341-342). Plaintiff reported continuing to have "very severe back pain" which he described as a 6 out of 10 "but previously it has been much more than that." The pain was nonradiating. He also reported bilateral knee pain. "He had an injection done in his knee about a year ago and that seemed to help. . . . He is wondering if another injection may be helpful today." Plaintiff continued to smoke, and he had not been monitoring his diet. "His mood is improving a little bit but still down. . . . He denies lower extremity weakness or numbness". Plaintiff had some tenderness at L2-L3 with minimal range of motion, but no measurements were provided. His knees were normal. "Full range of motion is appreciated." His lungs were normal. He was assessed with knee arthritis and was given an injection of Kenalog and lidocaine in his right knee. "He ambulated out of the examination room." Dr. Griggs recommended an MRI of plaintiff's back and told him to continue on the Naproxen (non-steroidal anti-inflammatory). He assessed depression and told plaintiff to continue on his Wellbutrin. He assessed obesity and "counseled [plaintiff] on diet and exercise." He advised him to stop smoking.

> On March 3, 2011, plaintiff had an MRI of his lumbar spine (Tr. at 348, 378). Baron

Adkins, D.O., assessed borderline spinal stenosis at L4-L5 and bilateral foraminal stenosis

(narrowing).  He had a subluxation (a slight misalignment of the vertebrae) of L5 on S1 with circumferential disc bulge without spinal stenosis.

On March 10, 2011, plaintiff had an epidural steroid injection in his spine (Tr. at 350-351).

On June 15, 2011,[4] plaintiff saw Dr. Griggs who refilled plaintiff's Metformin and started plaintiff on Norco (narcotic pain medication) with no refills (Tr. at 379).  He also started plaintiff on Naproxen (non-steroidal anti-inflammatory).  "Pain worsened due to . . . morbid obesity.  Consider neurosurgical evaluation."

On July 8, 2011, plaintiff saw Tomoko Tanaka, M.D., a neurosurgeon, at the request of Dr. Griggs (Tr. at 353-356).  Plaintiff complained of midline back pain that was "quite severe" and could be "debilitating at times."  Plaintiff said that movement of any kind, standing and sitting exacerbate the pain; and pain medication and lying on his side help his pain.  Plaintiff had not participated in physical therapy.  He had had three injections, "the last one 2 months ago, which improved his symptoms about 30% to 35%".  Plaintiff's medications were listed as Amitriptyline (antidepressant), aspirin, Metformin (for diabetes), Vicodin (narcotic pain reliever), Bupropion (an antidepressant that also aids in quitting smoking), and Naprosyn (also called Naproxen, a non-steroidal anti-inflammatory).  Plaintiff continued to smoke a pack of cigarettes per day.  "We discussed the impact of smoking on spine health, and the implications for surgery, and he was highly recommended for smoking cessation."

A 12-point review of systems was performed and "all was negative" except plaintiff had hypertension, complained of difficulty breathing at night, had diabetes, and complained of numbness in his leg.  Dr. Tanaka described plaintiff as a pleasant man in no acute distress.  His lungs were clear.  "The patient is awake, alert and oriented.  Speech is fluent and appropriate."

---

[4]This is the second page of a record.  There is no first page to this record.

Motor strength was 5/5 in his arms and legs, range of motion was normal in his shoulder, elbows, wrists, fingers, knees, and ankles. Gait was antalgic "with the patient not bending his right knee." Patrick Maneuver[5] "elicits pain in the knee, not in the hip."

Straight leg raising was negative. Dr. Tanaka reviewed plaintiff's MRI. "MRI of the lumbar spine shows degenerative disk disease most significant at L5-S1 with minimal Modic changes.[6] There is a disk bulge in the midline not impinging on the neural elements. There is slight facet arthropathy [disintegration of cartilage]." Dr. Tanaka assessed lumbar spondylosis.[7]

> At this point in time the patient does not have a clear surgical etiology in his lumbar spine but he does have some degenerative disease, which gives him a reason for having back pain, but it does not appear to be amenable to surgery. We discussed with the patient the treatments for back pain, including physical therapy, anti-inflammatories and smoking cessation and weight loss, and stressed to him the importance of these. At this time, we will plan on obtaining flexion/extension x-rays of the lumbar spine to reassure the patient that he does not have any abnormal movement here. We will contact the patient with the results of these, and if negative we will plan for the patient to continue conservative therapies through his primary care physician.

---



Patrick's Test

[5]Patrick's test or FABERE test (for Flexion, ABduction, External Rotation, and Extension) is performed to evaluate pathology of the hip or sacroiliac joint.

[6]Modic changes are a common phenomenon on MRI in spinal degenerative diseases and strongly linked with low back pain.

[7]Spondylosis literally means stiffening or fixation of the bony building blocks of the spine (vertebrae) as the result of a disease process, degenerative changes in the spine such as bone spurs and degenerating intervertebral discs.

On July 14, 2011, Dr. Tanaka noted that plaintiff's flexion and extension x-rays "show no abnormal movement. We will plan to continue with conservative treatment." (Tr. at 356-357).

On July 20, 2011, plaintiff was admitted to Lake Regional Health System after suffering abdominal pain for several days (Tr. at 364-377). In the emergency room, a CT scan of his abdomen and pelvis suggested diverticulitis[8] with "no evidence of complications present" and plaintiff was started on IV antibiotics. Plaintiff reported that he had been diagnosed with diabetes several years earlier but that he does not follow a diabetic diet. He was noted to be morbidly obese. Plaintiff was noted to be taking only Metformin, a diabetes medication. "The patient does smoke a half pack of cigarettes daily. Does smoke marijuana on occasion." On exam plaintiff's lungs were clear but he was noted to ventilate "at best, fair." He was alert with a normal mood and affect. Plaintiff was started on clear liquids and his diet was advanced as tolerated. By the next day, he was "feeling much better." He was "eating, drinking, and ambulatory. His abdominal pain was essentially gone. . . . He was getting around and appeared able to care for himself in spite of his chronic back problems. He said he is not very mobile but his mobility was back to its usual state." Plaintiff was discharged with a prescription for Norco (narcotic pain medication) and antibiotics along with his other previously-prescribed medications, "activity as tolerated."

On November 25, 2011, Dr. Griggs completed interrogatories in connection with plaintiff's disability case (Tr. at 311-312). He listed the following diagnoses: major depressive disorder, bilateral knee arthritis, degenerative lumbar disc disease, diabetes type 2, morbid obesity, tobacco abuse, and restrictive lung disease. He limited plaintiff to lifting no more than

---

[8]Diverticulitis is small, bulging sacs or pouches of the inner lining of the intestine (diverticulosis) that become inflamed or infected. Most often, these pouches are in the large intestine (colon).

15 pounds, no stooping, no climbing, no bending, and no twisting. He indicated that plaintiff has "severe pain when standing > 10-15 minutes." With respect to sitting, he wrote, "Maximum sitting for 30 minutes at a time, needs to lay [sic] down in between or lean on side." He indicated that plaintiff is unable to stoop. When asked, "Is it necessary for the claimant to assume a supine or reclining position during the day due to pain or fatigue?" he wrote, "Yes, lumbar disc disease, pain." Finally, he indicated he had treated plaintiff for severe depression by prescribing Wellbutrin. "Patient refused counseling."

On November 28, 2011, plaintiff was seen by Garth Russell, M.D., of Columbia Orthopaedic Group (Tr. at 381-389). Plaintiff reported an inability to work over his head, to do extensive lifting, or to turn his head from side to side. "He is unable to stand for longer than 15 to 20 minutes. In addition, there is pain with sitting for any extensive period. He has to lay [sic] down and rest but he must do it on his back or his stomach because he cannot position on his sides because of the pain." Plaintiff weighed 320 pounds. He sat in his chair bent to the side. "He has much difficulty getting into a standing position and has to lift himself out of the chair with his arms. He walks with an unstable gait with limping somewhat on the right side. He is unable to walk on his toes or his heels because of strength and/or instability." Plaintiff was observed to have "generalized weakness" in his left arm "but it is hard to gauge because of the patient's participation and pain." Plaintiff had only 30 degrees of forward flexion in his lower back.

Dr. Russell reviewed and summarized plaintiff's medical treatment records. With regard to the record of Dr. Griggs in 2010 when Dr. Griggs referred to plaintiff as having "complete decompensation mentally", Dr. Russell stated that plaintiff "was placed on an intense program with wellbutrin an antidepressant." It is unclear what the "intense program" references, as the only treatment Dr. Griggs provided for plaintiff's depression and "complete

decompensation" was a prescription for Wellbutrin. Dr. Russell summarized the records of Dr. Tanaka[9] which are dated July 8, 2011 -- less than five months earlier. Dr. Russell said that plaintiff reported to Dr. Tanaka that his pain was "improved by lying down." Dr. Tanaka's records actually state that plaintiff's pain was improved by lying on his side. However, Dr. Russell did not notice the discrepancy between that record and his own record which states that plaintiff is unable to lie on his side due to pain and must either lie on his stomach or his back.

Dr. Russell, in summarizing Dr. Tanaka's record, stated, "It was felt in spite of indications for surgery, considering the person's age and general condition that it was somewhat risky." There is no such indication in the neurosurgical records to which Dr. Russell refers. Dr. Tanaka's record states, "[T]he patient does not have a clear surgical etiology in his lumbar spine but he does have some degenerative disease, which gives him a reason for having back pain, but it does not appear to be amenable to surgery."

Dr. Russell mentioned plaintiff's neurosurgery record dated December 10, 2009 (which is the record of Usiakimi Igbaseimokumo, M.D.) and said that his "examination at that time revealed severe degenerative disc disease of the lower back." Dr. Igbaseimokumo's examination did not reveal severe degenerative disc disease of the lower back. The record indicates that plaintiff had "very mild degenerative changes involving the L5-S1 level." Plaintiff had been told by Dr. Igbaseimokumo to lose weight.

Dr. Russell's own assessment, after examining plaintiff and summarizing all of plaintiff's medical records, included the following:

1.     Reactive depression, chronic, severe

---

[9]Dr. Russell referred to the records as those of Dr. Brad Alan Hiser; however, Dr. Hiser was a resident at the time and Dr. Tanaka was the supervising neurosurgeon. Dr. Hiser is listed as the dictator of the record, and Dr. Tanaka refers to him as a resident.

2. Exogenous obesity, severe

3. Degenerative disc disease, chronic with spinal stenosis L4-5, moderately severe

4. Diabetes mellitus Type 2

5. Acromioclavicular (shoulder) joint dislocation, chronic with degenerative changes

Dr. Russell concluded with the following:

It is my medical opinion that this patient will continue to survive only with a significant amount of medical attention and medications. He will spend most of his time in a recumbent position because of the pain. In addition, he would be unable to sit longer than 20 to 30 minutes or to stand for about that same length of time. His condition is chronic and will continue through the remainder of his life.

## C. SUMMARY OF TESTIMONY

During the May 10, 2012, hearing, plaintiff testified; and Julie Svec, a vocational expert, testified at the request of the ALJ.

### 1. Plaintiff's testimony.

At the time of the hearing plaintiff was 48 years of age, 6 feet tall, and weighed 270 pounds (Tr. at 31). He was divorced and had a 20-year-old child who was not living with plaintiff (Tr. at 31-32). Plaintiff was living alone in a mobile home (Tr. at 32). Plaintiff had a valid driver's license and drove about three times a month to the grocery store, the bank, and to the doctor (Tr. at 32). Plaintiff's son drove him to the hearing which was about a 60-mile trip (Tr. at 32-33). He had to stop and get out of the car once during the trip because the movement of the car was hurting his back (Tr. at 33).

Plaintiff has a high school education with additional training in auto mechanics (Tr. at 33). Plaintiff was living off his son's child support even though his son was living at college (Tr. at 33). Plaintiff was getting Medicaid health insurance and food stamps (Tr. at 34).

Plaintiff worked from January 1996 to July of 2008[10] carrying lumber and 100-pound bags of concrete, two at a time (Tr. at 35-36). He built decks and did basic construction (Tr. at 36).

Plaintiff experiences pain in his lower and mid back (Tr. at 37). The pain radiates down both legs (Tr. at 38). Plaintiff's pain is worse with sitting, standing, bending, going up stairs, and any kind of movement (Tr. at 38). Plaintiff spends all day lying on the couch with pillows tucked around him (Tr. at 38-39). Plaintiff's pain interferes with his sleep (Tr. at 39). Plaintiff had an epidural steroid injection that did not help (Tr. at 41).

Plaintiff cooks things like pot roast or a large skillet of taco meat that will last him a while (Tr. at 39). He only showers once or twice a week because he has difficulty getting in and out of the tub (Tr. at 39-40). He does about two or three loads of laundry per month (Tr. at 40). He goes to the grocery store about once a month (Tr. at 40).

Since plaintiff cannot do much, losing weight can only be accomplished through starving himself (Tr. at 40-41). He had lost about 80 pounds at the time of the hearing (Tr. at 41).

Plaintiff has diverticulitis[11] which causes him to have severe abdominal pain about every three days, and the pain lasts half a day to a full day (Tr. at 41-42).

Plaintiff has severe pain in his knees (Tr. at 44). He was on Vicodin, but he stopped taking all pain medicine because of his diverticulosis (Tr. at 44-45). His pain did not get worse when he stopped taking his medication (Tr. at 45). Lying down on his bed with a heating pad is the only thing that has helped with his pain (Tr. at 45). Plaintiff said his doctor does not like

---

[10]Plaintiff's last reported earnings, according to the Social Security Administration records, was in 2005.

[11]Plaintiff and the ALJ appeared to use the terms diverticulitis and diverticulosis interchangeably even though they are not the same condition.

that plaintiff is not taking any pain medicine, but "he understands kind of because of the diverticulosis that I don't want to put anything else in through my intestines." (Tr. at 45-46). Plaintiff believed his pain medicine had something to do with diverticulosis (Tr. at 46). He believed this condition caused him to be constipated although those symptoms were improving (Tr. at 46).

Plaintiff was no longer taking Metformin for diabetes (Tr. at 46).

## 2.    Vocational expert testimony.

Vocational expert Julie Svec testified at the request of the Administrative Law Judge. Plaintiff's past relevant work consists of wallpaper hanger, DOT 869.664-014, which is normally performed at the heavy exertional level but was performed at the medium level by plaintiff, and it has an SVP of 4 which is semiskilled work (Tr. at 50).

The first hypothetical involved a person who could lift 10 pounds occasionally and less than 10 pounds frequently; stand or walk for 2 hours per day; sit for 6 hours per day; occasionally climb ramps or stairs; never climb ladders, ropes or scaffolds; occasionally stoop, kneel, crouch, crawl or balance (Tr. at 50). Such a person could not perform plaintiff's past relevant work (Tr. at 50). However, the person could work as an assembler, DOT 734.687-018, SVP of 2, with 1,000 in Missouri and 90,000 in the country (Tr. at 51). The person could work as a weight tester, DOT 539.485-010, SVP of 2, with 400 positions in Missouri and 23,000 in the country (Tr. at 51). The person could work as an order clerk, DOT 209.567-014, SVP 2, with 400 in Missouri and 23,000 in the country (Tr. at 51).

The second hypothetical was the same as the first except the person could lift 15 pounds; could perform no stooping, climbing, bending or twisting; and could stand for 10 to 15 minutes and sit for 30 minutes but would then need to lie down (Tr. at 51). Such a person could not work (Tr. at 51).

The third hypothetical was the same as the first except the person would need to lie down six hours per work day (Tr. at 51-52). Such a person could not work (Tr. at 52).

## V.   FINDINGS OF THE ALJ

Administrative Law Judge Ross Stubblefield entered his opinion on May 21, 2012 (Tr. at 10-22). Plaintiff's last insured date was December 31, 2010 (Tr. at 12).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date of April 14, 2010 (Tr. at 12).

Step two. Plaintiff suffers from the following severe impairments: degenerative disc disease, degenerative joint disease of the bilateral knees, and obesity (Tr. at 12). The ALJ found that plaintiff's diabetes mellitus, hypertension, diverticulitis and ganglion cyst on his thumb to be non-severe because he had not experienced any functional limitations in his ability to perform basic work activities because of those impairments (Tr. at 12-13). Plaintiff's depression is non-severe because although medically determinable, it does not cause more than a minimal limitation in his ability to perform basic mental work activities (Tr. at 13).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15-16).

Step four. Plaintiff retains the residual functional capacity to lift 10 pounds occasionally and less than 10 pounds frequently; stand or walk for 2 hours per day; sit for 6 hours per day; can never climb ladders, ropes or scaffolds; can occasionally climb ramps or stairs, stoop, kneel, crouch, crawl and balance (Tr. at 16). The ALJ considered plaintiff's obesity in assessing this residual functional capacity (Tr. at 18). With this residual functional capacity, plaintiff is unable to perform his past relevant work (Tr. at 20).

Step five.  Plaintiff is able to perform other jobs available in significant numbers, such as assembler, weight tester, and order clerk (Tr. at 20-21).  Therefore, plaintiff is not disabled (Tr. at 21).

## VI.    OPINION OF DR. GARTH RUSSELL

Plaintiff first argus that the ALJ erred in discrediting the opinion of Dr. Garth Russell who saw plaintiff on one time (November 28, 2011) and provided the following opinion:

> It is my medical opinion that this patient will continue to survive only with a significant amount of medical attention and medications.  He will spend most of his time in a recumbent position because of the pain.  In addition, he would be unable to sit longer than 20 to 30 minutes or to stand for about that same length of time.  His condition is chronic and will continue through the remainder of his life.

Plaintiff points out that the ALJ incorrectly referred to Dr. Russell as a nonexamining physician when in fact he examined plaintiff on that one occasion.  The ALJ's analysis of Dr. Russell's opinion follows:

> I have similarly given little weight to the opinion of nonexamining orthopedist Garth S. Russell, M.D.  In November 2011, Dr. Russell opined that the claimant "will continue to survive only with a significant amount of medical attention and medications . . . will spend most of his time in a recumbent position because of pain," and is unable to either sit or stand for more than 20 or 30 minutes at a time.  As is noted above, Dr. Russell was a nonexamining physician.  He did not have either a treating or examining relationship with the claimant.  Far more significant is the fact that his conclusions are not supported b the record.  The evidence of record does not objectively document either medical signs or laboratory findings consistent with a disabling level of pain, let alone impairments that the claimant will not survive without "a significant amount of medical attention and medications."  Indeed, such a statement far exceeds anything the claimant has alleged.  Accordingly, Dr. Russell's opinion has been given little weight.

(Tr. at 19).

The ALJ's mischaracterization of Dr. Russell as a nonexamining source does not require reversal of his decision.  The regulations provide that medical opinions of examining physicians generally will be given more weight than the opinion of a medical source who has not examined a claimant.  20 C.F.R. § 404.1527(c)(1).  With respect to opinions of nonexamining sources, "we apply the rules in paragraphs (a) through (d) of this section," i.e.,

26

the same rules as for examining sources. There are additional rules that apply to the opinions of State Agency nonexamining sources. However, the only difference between the opinion of an examining nontreating source and a nonexamining nontreating source who is sought out by the claimant as opposed to Disability Determinations is that "Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."

The regulations also provide that the ALJ must explain in the decision the weight given to the opinions of State agency consultants "as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us." 20 C.F.R. § 404.1527(e)(2)(ii).

In this case, the substantial evidence in the record supports the ALJ's decision to give little weight to the opinion of Dr. Russell. As pointed out in the summary of medical records above, Dr. Russell misstated plaintiff's treatment records in significant respects. His opinion that plaintiff "will not survive" without significant medical attention and medications is contradicted by the fact that plaintiff was on NO pain medications at the time of his administrative hearing (and testified that stopping his pain medications had really made no difference), the record shows that he was rarely on anything stronger than a non-steroidal anti-inflammatory for his pain, he never required anything more than conservative treatment (and was repeatedly told to stop smoking, lose weight, and exercise, which he expressed no interest in doing), and plaintiff had required no medical appointments for any condition for the five months before his consultative exam with Dr. Russell. The ALJ noted that plaintiff's x-rays, MRIs, and treatment records contradict the opinion of Dr. Russell and do not support those significant restrictions which contradict even plaintiff's own allegations. The ALJ properly discredited Dr. Russell's opinion.

## VII.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in relying on plaintiff's work history in finding that plaintiff's testimony was not credible.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or

28

other symptoms; and any measures other than treatment the individual uses or has used to

relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20

minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of

disability are as follows:

> The claimant's allegations regarding his back and knee pain are not corroborated by the objective medical evidence of record. Diagnostic imaging has revealed the presence of only mild degenerative changes in the claimant's back and knees. As to his spine, a November 2010 lumbar spine X-ray demonstrated only "mild degenerative changes" and an "[o]ld slight compression deformity of T12," which is stable. Similarly, a March 2011 lumbar spine magnetic resonance imaging scan ("MRI") demonstrated only mild degenerative changes in the claimant's lumbar spine, including "borderline spinal stenosis at L4-L5," mild bilateral foraminal stenosis, and degenerative changes at L5-S1 with a non-impinging bulging disc. As to his knees, bilateral knee X-rays performed in November 2010 revealed only "mild degenerative changes of the medial joint compartment." Consistent with the foregoing laboratory findings, the claimant has not presented upon examination with serious medical signs. The claimant has presented with tenderness in the lumbar spine and left sciatic notch, a diminished range of lumbar motion, decreased hip flexion strength, and some diminished sensation in his lower extremities. Specifically, he has presented with decreased sensation to light touch in the left lateral foot and right medial foot, as well as decreased sensation to pinprick in a manner similar to sock anesthesia. He also ambulates with a ginger and recently antalgic gait. However, he has not presented with any more significant motor, sensory, reflex, or strength deficits. The claimant's range of motion of his upper and lower extremities has not been diminished and his reflexes are normal. He retains full strength in both his upper and lower extremities, including in his knees. Also of significant, straight leg raise testing has been negative bilaterally.

> Additionally, the few treatment measures that the claimant has utilized to manage his pain have been utilized only rarely and have been both routine and conservative in nature. The claimant did not seek treatment for his back impairment between December 2009 and November 2010. When he did attend a doctor's appointment in November 2010, the claimant refused all recommended treatment measures, including a prescription for pain-relieving medications, epidural spinal injections, and an orthopedic consultation, thus indicating he did not then consider his musculoskeletal pain to be so serious as to warrant the utilization of even conservative treatment measures. The claimant did eventually utilize a series of three epidural injections, beginning in March 2011. He reported that those procedures were effective at ameliorating between 30 and 35 percent of his back pain. The claimant also began to take prescription Naproxen to alleviate his musculoskeletal pain in June 2011; however, he was not taking any prescription medications for his pain by the time of the May 2012 administrative hearing. Despite his testimony that he ceased taking medication because it exacerbated his diverticulitis, no medical recommendation to stop

taking Naproxen appears in the record. Indeed, the claimant was continued on Naproxen upon discharge from the hospital following his July 2011 diverticulitis-related admission. The claimant's decision to cease medical intervention for his musculoskeletal impairments in the absence of medical advice to do so suggests that his pain is not as distressing as alleged. Additionally, despite some gait abnormalities, the claimant has not been prescribed the use of any assistive devices in order to ambulate effectively. Furthermore, other than the use of a heating pad, the claimant has not utilized alternative treatment measures, such as physical therapy, massage therapy, or chiropractic manipulations. The totality of the foregoing demonstrates that the claimant's back and knee impairments, while bothersome, have not resulted in the sort of medical signs or laboratory findings, nor prompted the sort of medical care, that would be consistent with an inability to perform sedentary work as described at Finding 5. . . .

The credibility of the claimant's allegations is eroded by his work history for two reasons. First, the record suggests that the claimant's ongoing unemployment may be for reasons unrelated to his impairments. The claimant stopped working in July 2008. The claimant was not "disabled" from the period between July 2008 and April 14, 2010, his alleged onset date of disability. Despite not being "disabled" during that period, the claimant neither worked nor sought employment. (Claimant's Testimony). The fact that the claimant was unemployed and did not seek any employment during a time that he was not "disabled" suggests that his current unemployment may be for reasons unrelated to his purportedly disabling conditions. This implication is enhanced by the fact that the record does not objectively document a worsening of the claimant's physical condition since that period.

Second, the claimant did not report earnings in 2006, 2007, or 2008, despite having been employment full time during those years. (Exhibits B4D/2, B5D, B6D/3). The claimant reported being employed during all of 2006 and 2007, as well as through July 2008. During that time, he was working a 40-hour per week work schedule and earning $10.00 per hour for his efforts (Exhibit B3E/2). This means that the claimant should have posted earnings of approximately $1,600.00 per month from January 2006 through June 2008. However, as is noted above, the claimant did not report any such earnings. This means that the claimant has either inaccurately reported his work history to the Social Security Administration, or failed to properly report his earnings to the Internal Revenue Service. In either event, the claimant's actions erode the credibility of his allegations.

Furthermore, the claimant's allegations regarding experiencing constant, intractable pain that requires he lay [sic] down at all times during the day are inconsistent with the fact that he is able to live independently.

(Tr. at 17-19).

Plaintiff argues that the ALJ erred in relying on plaintiff's lack of work because plaintiff

previously filed an application for disability benefits on July 15, 2008, and that was denied on

April 14, 2010.  However, as noted in the quoted portion of the ALJ's opinion above, the ALJ

relied heavily on many other factors, including the fact that plaintiff worked full time for

several years and apparently failed to report those earnings to the Internal Revenue Service.

Plaintiff's earnings record also shows a of history low earnings (plaintiff's earnings reached

$1,000 per month in only one year of his entire life) which suggests either a life-long lack of

motivation to work or additional years of under-reporting his income.  From 1997 when

plaintiff was 33 years of age, until 2007 (the year before the end of his work history), full time

work at minimum wage would have resulted in annual earnings of $10,712.  However, during

all of those years plaintiff reached those annual earnings only during 2002 (with annual

earnings of 11,022, or $310 more than minimum wage).  All other years were below that

amount which establishes that either plaintiff did not work full time during any of that time

other than 2002 or that he under-reported his income.  The fact that he claimed in his Work

History Report that he was earning $10 an hour during that time (and minimum wage was

$5.15) further suggests that plaintiff has rarely if ever worked full-time during his lifetime.

The ALJ clearly relied on and discussed all of the Polaski factors.  The substantial

evidence in the record as a whole supports the ALJ's credibility analysis, including his reliance

on plaintiff's prior work record.

## IX.    *MENTAL LIMITATIONS*

Plaintiff next argues that the ALJ erred in failing to include mental limitations in the

residual functional capacity.

In order to meet the threshold "severity" requirement at step two, a claimant has a

two-step burden to show he has (1) a "medically determinable" impairment or combination of

impairments which (2) significantly limits his physical or mental ability to perform basic work

activities without regard to age, education, or work experience, for the required 12-month

duration required by the Act.  20 C.F.R. §§ 404.1520(c) and 404.1521(a); <u>Steed v. Astrue</u>, 524

F.3d 872, 875 (8th Cir. 2008). "Medically determinable" means there must be objective

evidence confirming the existence of the alleged impairment; subjective symptoms alone are

not sufficient no matter how genuine the claimant's complaints appear to be.  SSR 96-4p ("No

symptom or combination of symptoms can be the basis for a finding of disability, no matter

how genuine the individual's complaints may appear to be, unless there are medical signs and

laboratory findings demonstrating the existence of a medically determinable physical or

mental impairment.").  Once the claimant has demonstrated a medically determinable

impairment, the second part of the test requires him to show that his impairment also limits his

ability to perform basic work-related activities such as walking, sitting, and lifting.  Mental

functions include understanding, performing, and remembering simple instructions; using

judgment; responding appropriately to supervision, co-workers, and usual work situations;

and dealing with changes in a routine work situation.  20 C.F.R. § 404.1521(b).

There is also a "special technique" used to assess the severity of mental impairments

that was used by the ALJ in this case.  20 C.F.R. §§ 404.1520a(c)(3), (d)(1) and

416.920a(c)(3), (d)(1); 20 C.F.R. pt. 404, subpt. P, app. 1, §12.00C.  Under the special

technique, the ALJ analyzes a claimant's ability to function in four general domains: daily

living, social function, persistence and pace, and episodes of decompensation.  For the first

three domains, the ALJ will rate the claimant on a five-point scale beginning with "none," then

"mild," "moderate," "marked," and "extreme."  Decompensation is rated on a four-point scale:

"none," "one or two," "three," or "four or more."  20 C.F.R. §§ 404.1520a(c) and 416.920a(c).

If a claimant's mental limitations are mild, the mental impairment will be assessed as

non-severe.  20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).

This step two assessment is de minimis; the claimant need show only a minimal work-related effect. Nguyen v. Chater, 75 F.3d 429, 431 (8th Cir. 1996). On the other hand, the severity standard is not toothless, and the Eighth Circuit has frequently upheld findings of no severe impairment. See Kirby v. Astrue, 500 F.3d 705, 708 (8th Cir. 2007) ("Severity is not an onerous requirement for the claimant to meet . . . but it is also not a toothless standard, and we have upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing." (internal citations omitted)).

The ALJ analyzed at length plaintiff's possible mental impairment -- an impairment which was not alleged in plaintiff's application for disability benefits. The ALJ noted that plaintiff is able to live alone and perform essential tasks associated with independent living (according to plaintiff's testimony), has no limitations in his ability to meet his personal care and grooming needs because of a mental impairment (according to his Function Report), is able to perform routine household chores (according to plaintiff's testimony). Plaintiff's alleged limitation in performing routine household chores was due to physical difficulties, not mental difficulties. Plaintiff is able to go out alone, and he is able to drive. There is no record of any difficulty getting along with others, and no such difficulty was ever alleged. Plaintiff stated in his Function Report that he has no problems understanding things, following instructions, concentrating or remembering things. He does not need special reminders for personal needs and grooming or to take his medications as prescribed. He can manage his own finances. Finally,

> the claimant has experienced no episodes of decompensation that have been of extended duration. The record does not establish that, since his alleged disability onset date, the claimant has . . . experienced an exacerbation or temporary increase in the symptoms or signs of his mental impairment, accompanied by a loss of adaptive functioning, which lasted for a period of at least two weeks.

(Tr. at 14).

33

Plaintiff points to several medical records which support his argument that, despite the above remarks by the ALJ, plaintiff should have been found to have mental limitations in his residual functional capacity:

1.    **Dr. Griggs's comment that plaintiff was suffering "complete decompensation due to major depressive disorder . . . [W]e are not going to make any headway with the patient until we get his mood under better control.**

During this visit (November 3, 2010), Dr. Griggs noted that he had not seen plaintiff for almost a year.  Plaintiff's allegations on that date consist of the following:  "The patient admits of feeling hopeless and helpless and admits that he has not taken any of his medications for the last several months.  He denies however any suicidal or homicidal ideations.  He has applied for disability and apparently been turned down".  Dr. Griggs performed an exam and did not note even one abnormal mental symptom.  He observed that plaintiff was in no acute distress.  He did not observe that plaintiff appeared sad, that plaintiff was crying, that plaintiff was unable to understand Dr. Griggs or that plaintiff was unable to converse appropriately.  He did not observe that plaintiff's speech was incoherent or illogical or that plaintiff was unable to maintain a train of thought.

In support of his comment that "we are not going to make any headway with the patient until we get his mood under better control", Dr. Griggs stated as follows:  "He feels let down by physicians and the fact that he has been deemed to [be] a nonsurgical [candidate] and he also feels let down by society [because] they did not grant him disability."  Dr. Griggs agreed in this record that plaintiff was probably not a good surgical candidate.  He noted that plaintiff said he did not want any pain medications.  Dr. Griggs prescribed nothing more than Wellbutrin, an antidepressant, to treat plaintiff's "complete decompensation" and "major depressive disorder."  And finally, Dr. Griggs stated, "We would strongly recommend the

patient reapply for disability given these multiple medical problems and we may need to get a lawyer to help him to do so." Despite the scarce medical findings and almost no treatment in this medical record, Dr. Griggs's advocacy is remarkable.

To put this particular medical record in context, I will summarize the medical notes of Dr. Griggs in the appointments surrounding this one:

1. On August 14, 2009, Dr. Griggs saw plaintiff for the first time and started him on Mobic (non-steroidal anti-inflammatory), Elavil (an antidepressant) "for neuropathic pain," and Tramadol (a non-narcotic pain reliever) for breakthrough pain. He did not make any mental assessments, nor did he treat plaintiff for any mental condition. He specifically stated that the antidepressant was for "neuropathic pain."[12] He advised plaintiff to stop smoking. He counseled plaintiff on diet and exercise. "The patient has a lot of excuses why he cannot exercise. Money is the main reason but he seems to be able to afford a pack of cigarettes a day. I have recommended the water aerobic class which is $5 a session 2 times a week and he is adamantly against that at this point. I explained to him walking is free, so we can initiate that."

2. On August 28, 2009, plaintiff saw Dr. Griggs due to diarrhea. No mental symptoms were observed, no mental condition was assessed, no treatment was provided.

3. On December 1, 2009, plaintiff saw Dr. Griggs for back pain. No mental symptoms were alleged, none were observed, and none were treated.

4. Eleven months later, on November 3, 2010, Dr. Griggs referred to plaintiff's "complete decompensation." During the year prior to this appointment, plaintiff had been seen by Usiakimi Igbaseimokumo, M.D., who observed no abnormal mental symptoms.

5. On November 10, 2010 -- exactly one week after Dr. Griggs noted a "complete decompensation," plaintiff saw Dr. Griggs again. On this day, Dr. Griggs said, "he continues to have some depressed mood but he is tolerating Wellbutrin. . . . He denies being depressed but complains of anhedonia, hopelessness, and feeling sad." There were no further allegations of or observations of any mental symptoms. Dr. Griggs continued plaintiff on his same dose of Wellbutrin. Therefore, even if plaintiff had had an episode of decompensation the week before, it clearly improved significantly and quickly.

6. On January 25, 2011, Dr. Griggs noted, "he still has some depression." Dr. Griggs made no abnormal mental findings when he performed an exam. He continued

---

[12]Neuropathic pain is a complex, chronic pain state that usually is accompanied by tissue injury. With neuropathic pain, the nerve fibers themselves may be damaged, dysfunctional, or injured. hese damaged nerve fibers send incorrect signals to other pain centers. The impact of nerve fiber injury includes a change in nerve function both at the site of injury and areas around the injury.

plaintiff on the same dose of the same antidepressant, indicating that he believed this medication was adequately controlling plaintiff's symptoms.

Finally, I note that Dr. Griggs is not a mental health specialist, and a mental health specialist who examined plaintiff did not find significant limitations based on any mental impairment.

**2. Record of Kim Dempsey, Psy.D. -- He attributed all his problems to physical problems. At 4 years of age he was removed from biological parents for child abuse. Disheveled appearance and marginally adequate hygiene.**

Dr. Dempsey saw plaintiff one time in connection with his application for disability benefits. She assessed adjustment disorder with depressed mood. Her "moderate" findings were plaintiff's occupational problems and economic problems. His disheveled appearance and marginally adequate hygiene were (1) never observed by any other medical professional, and (2) allegedly caused by plaintiff's difficulty getting in and out of his tub, not by any mental impairment. She also noted that plaintiff "reported mild depressive symptoms related to adjustment to his medical problems and chronic pain, but denied any moderate or severe psychological symptoms." And indeed she did not find any. Even his scores on mental tests were noted to be slightly reduced due to his pain and shifting around in his chair because of pain, not due to any mental symptom.

**3. Record of Dr. Temple, Lake Regional Hospital, "he does tend to be anxious and depressed, even though he tends to deny it."**

Dr. Temple treated plaintiff for diverticulitis in July 2011. This comment actually appeared in a list of plaintiff's subjective complaints, not in Dr. Temple's observations. Dr. Temple did not assess any mental impairment. Even though he treated plaintiff for diverticulitis, his assessments were thorough including morbid obesity, hypertension, GERD, chronic neck and low back pain, and adult onset diabetes mellitus; therefore, if he had believed

plaintiff suffered from depression it likely would have been listed among the other diagnoses. There were no other indications in the record of complaints, observations or treatment dealing with any mental impairment.

### 4. Dr. Russell's statement that plaintiff has "severe reactive depression."

Dr. Russell's opinion has already been thoroughly addressed above. His opinion is not entitled to any significant weight.

### 5. Plaintiff's statement dated March 29, 2012, that he feels like crying for no reason and usually wears the same clothes for three or four days.

Plaintiff prepared this statement about six weeks before his administrative hearing during which he did not testify about any mental impairment. Further, his allegation in this statement about wearing the same clothes was allegedly due to his physical problems getting in and out of a tub and doing laundry, not because of any mental impairment.

Plaintiff's argument is not with the ALJ's finding that plaintiff only has a mild mental impairment, it is with the ALJ's alleged failure to address each of these pieces of evidence suggesting that plaintiff has a mental impairment. This argument is without merit. As discussed above, the ALJ thoroughly discussed Dr. Russell's opinion and properly gave it little weight. He did discuss the opinion of Dr. Dempsy who is a psychologist, and he afforded her opinion "considerable weight." Dr. Temple did not treat plaintiff for any mental impairment, did not observe any mental symptoms, and did not assess any mental condition; therefore, the ALJ was not required to mention that plaintiff said he tends to be anxious and depressed despite tending to deny that he has those symptoms. Finally, the ALJ did discuss Dr. Griggs and gave "little weight" to his opinion.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding with respect to plaintiff's mental impairment and that the ALJ properly evaluated the evidence of record in that regard.

## X.      EVALUATION OF THE RECORD AS A WHOLE

Finally, plaintiff argues that the ALJ failed to evaluate the record as a whole. He cites mainly to the various treatment records of Dr. Griggs. However, I note that Dr. Griggs was a primary care provider, and plaintiff's back and knee conditions were evaluated and treated by orthopedic specialists. X-rays and MRI scans support the findings of the orthopedic specialists who recommended nothing more than conservative treatment including losing weight, exercising, and smoking cessation. To the extent that Dr. Griggs's records conflict with those of the specialists, they would not be entitled to controlling weight. The ALJ properly noted that Dr. Griggs rarely treated plaintiff with anything more than a non-steroidal anti-inflammatory for his pain, he never treated any mental condition with anything other than the same dose of Wellbutrin for several years, he repeatedly told plaintiff to stop smoking, lose weight (which, to plaintiff's credit, he had been doing at the time of his administrative hearing), and most importantly -- to exercise. He did not limit any of plaintiff's activities, but instead encouraged him to walk for exercise and to do water aerobics. Dr. Griggs's opinion as to plaintiff's mental condition has already been addressed above.

## XI.      CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 6, 2014